O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| ROCK RIVER COMMUNICATIONS, INC., | Case No. CV08-635 CAS (AJWx) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| UNIVERSAL MUSIC GROUP, INC., ET AL.; | |
| Defendants. | |
| _____ | |

## I.    INTRODUCTION & BACKGROUND

Plaintiff Rock River Communications, Inc. is a producer, seller, and distributor of music records. Fourth Amended Complaint ("FAC") ¶ 4. In 2006, plaintiff created certain "remixed" recordings of reggae music originally recorded by Bob Marley and the Wailers between 1969 and 1972 ("the Recordings"). FAC ¶¶ 11. Plaintiff acquired licenses for the Recordings from a company called San Juan Music ("San Juan"). FAC ¶ 13. San Juan allegedly possessed a non-exclusive license for the Recordings that it had acquired from Lee Perry, the original producer of the Recordings. FAC ¶ 12.

///

Defendant Universal Music Group, Inc., is the owner of Island Records. FAC ¶ 10. Bob Marley recorded for Island Records between 1973 and his death in 1981, and defendant, through Island Records, controls the rights to a large percentage of Marley's recordings Id. Defendant allegedly acquired a non-exclusive interest in the Recordings through its acquisition of Polygram Group Canada and Sanctuary Records, both of which allegedly possessed non-exclusive rights to the Recordings. FAC ¶¶ 15, 16. Defendant also acquired an allegedly exclusive interest in the Recordings pursuant to a license from a company known as JAD.[1] FAC ¶ 17. In October 2007, defendant sent "cease and desist" letters to several distributors of plaintiff's remixed recordings, including some internet-based distributors, asserting that it had exclusive rights to the Recordings and threatening copyright infringement actions. FAC ¶ 28. Due to these threats, the distributors stopped distributing plaintiff's recordings. FAC ¶ 30.

On January 31, 2008, plaintiff filed a complaint claiming that defendant's conduct in sending "cease and desist" letters violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and tortiously interfered with plaintiff's prospective business advantage. After defendant filed a motion to dismiss, plaintiff filed its first amended complaint. On August 25, 2008, this Court granted in part and denied in part defendant's motion to dismiss plaintiff's first amended complaint with leave to amend. On September 15, 2008, plaintiff filed its second amended complaint. On December 22, 2008, the Court granted defendant's motion to dismiss with leave to amend. The Court further granted plaintiff 60 days within which to conduct discovery.

On April 2, 2009, plaintiff filed its third amended complaint alleging claims against defendant for (1) attempting to monopolize the reggae genre of sound recordings in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2)

---

[1] The license provides that "Subject to Clause 2.2, Licensor hereby grants to the Company an exclusive license during the Term and throughout the Territory [defined as 'the World'] to exercise any and all of the rights exercisable by a copyright owner in respect of the entire copyright (whether vested, contingent, or future) and all rights of action and all other rights of whatever nature. . . ." Groban Decl. Ex. A. at § 2.1

restraining trade and threatening to create a monopoly in the reggae genre sound recordings market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; (3) intentional interference with prospective economic advantage; and (4) knowingly and materially misrepresenting that plaintiff's album infringed defendant's copyright, in violation of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(f).

On October 16, 2009, plaintiff filed a motion for leave to file a fourth amended complaint, and on November 16, 2009, the Court granted plaintiff's motion. Thereafter plaintiff filed its fourth amended complaint against defendants UMG Inc., UMG Recordings, and UMGI, againalleging claims for (1) attempting to monopolize the reggae genre of sound recordings in the United States in violation of Section 2 of the Sherman Act; (2) restraining trade and threatening to create a monopoly in the reggae genre sound recordings market in violation of Section 7 of the Clayton Act; (3) intentional interference with prospective economic advantage; and (4) knowingly and materially misrepresenting that plaintiff's album infringed defendants' copyright, in violation of the DMCA.

On December 21, 2010, plaintiff filed the instant motion for summary adjudication as to defendants' Noerr-Pennington and California litigation privilege affirmative defenses. On January 20, 2011, defendants filed an opposition to plaintiff's motion. On January 31, 2011, plaintiff filed a reply in support of its motion. On December 21, 2010, defendants filed the instant motion for summary judgment as to the entire action. On January 19, 2011, plaintiff filed an opposition to defendants' motion. On January 31, 2011, defendants filed a reply in support of their motion. A hearing was held on March 14, 2011. Plaintiff filed a supplemental brief on March 15, 2011. Defendants filed a response to plaintiff's supplemental brief on March 17, 2011. On April 11, 2011, plaintiff filed a notice of a decision that it believed the Court might find persuasive. On April 14, 2011, defendants filed a response to the notice of decision. Having carefully considered the pleadings, all of the filings and submissions of the parties and the parties' oral arguments, the Court finds and concludes as follows.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); see also Fed. R. Civ. P. 56(c), (e).  The nonmoving party must not simply rely on the pleadings and must do more than make "conclusory allegations [in] an affidavit."  Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990); see also Celotex, 477 U.S. at 324.  Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322; see also Abromson v. Am. Pac. Corp., 114 F.3d 898, 902 (9th Cir. 1997).

In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 & n.3 (9th Cir. 1987).  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co., 121 F.3d 1332, 1335 (9th Cir. 1997).  Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue.  See Matsushita, 475 U.S. at 587.

///

III.    **DISCUSSION**

    A.    **Plaintiff's Motion for Summary Adjudication as to Defenses**

Plaintiff's motion requests that the Court find "that UMG is not entitled to either a *Noerr-Pennington* or California litigation privilege defense." Mot. at 2. Plaintiff asserts that defendants are not entitled to assert these defenses because the communications in question were not made in connection with litigation, and therefore are not "petitioning activity" as required under both doctrines. "There never was any actual litigation, nor did UMG intend to engage in any litigation with respect to its allegedly exclusive license." Id. at 13.

With respect to the Noerr-Pennington defense, plaintiff asserts that "a cease and desist letter directed to a private party is not a petition and not automatically entitled to immunity." Id. at 7, citing EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp., 711 F. Supp. 2d 1074, 1082 (C.D. Cal. 2010). Plaintiff argues that to trigger the doctrine, such letters must be "sufficiently related to petitioning activity." Mot. at 8, citing Sosa v. DirectTV, Inc., 437 F. 3d 923, 933 (9th Cir. 2006). "Consequently . . . . 'without contemplation of litigation,' a demand letter on its own would not be entitled to immunity." Mot. at 9, citing Cal. Pharmacy Mgmt.,LLC, v. Zenith Insur. Co., 669 F. Supp. 2d 1152, 1168 (C.D. Cal. 2009). "In this case, UMG's lack of intent to engage in litigation is evidenced by the fact that UMG never commenced any litigation to enforce its alleged exclusive license over the disputed Marley recordings. (*See* Cox Depo. at 149:15-150:5). Moreover, there is not a shred of evidence in the record that UMG ever seriously contemplated suing over Rock River's album, or had even gone through the basic process of obtaining the authorization to do so. (*See id.* at 148:23-149:14)." Mot. at 10. Plaintiff urges the Court to find that the communications were not prelitigation demand letters, but "other forms of threats or harassment," and therefore not protected by Noerr-Pennington, consistent with ICANN Transparency, Inc. v. VeriSign, Inc., 611 F. 3d 495, 505-506 (9th Cir. 2010), and Theme Promotions, Inc. v. News Am. Mktg. FSI, 546 F. 3d 991, 1007-08 (9th Cir. 2008). Id. at 10-11.

With respect to the California litigation privilege under California Civil Code section 47(b), plaintiff contends that to trigger the privilege, defendants' "threats of litigation must have been made in good faith with an actual and serious contemplation of an imminent resort to litigation." Id. at 11. Plaintiff argues that defendant's communications do not meet this standard as a matter of law. "UMG's communications were not made in good faith because there is no evidence that UMG intended to engage in 'imminent' litigation. . . . . Although UMG is aware of a multitude of potential 'infringements' of its 'exclusive' license, UMG has yet to commence **any** litigation to enforce its rights over the disputed Marley recordings. . . . Instead, UMG used the threat of potential litigation to organize a boycott of Rock River's album and otherwise interfere with Rock River's business relationships." Id. at 12.[2]

In opposition, defendants argue that, by conflating the requirements under the California litigation privilege and the Noerr-Pennington doctrine, plaintiff improperly shifts the burden on the issue of "sham" litigation to defendants and incorrectly asserts that defendants must demonstrate serious contemplation of litigation to invoke Noerr-Pennington. "No case imposes on Universal an evidentiary burden to make an initial showing that it 'actually intended' or 'seriously contemplated' litigation in order to invoke *Noerr-Pennington* immunity. . . . . This Court already has recognized this principle, and has concluded in written orders no fewer than three times that the demand letters on which Plaintiff bases its claims are facially immune . . . . *Sosa* also makes clear that, because demand letters are facially immune, if a plaintiff contends that these letters reflect nothing more than 'an attempt to interfere directly with the business relationships of another,' . . . the plaintiff's recourse is to prove 'sham.'"[3] Opp. at 1. Further, plaintiff argues, "to make out 'sham,' Rock River would have to establish as an initial matter than

---

[2]All quotations herein are emphasis in the original.

[3]Defendants argue that the "line of cases" cited by plaintiff to support its legal theory (*Sosa,*, *EcoDisc Tech. AG*, and *California Pharmacy Mgmt., LLC*) actually support defendants' interpretation of the law. Opp. at 5-10.

an effort to prove Universal's rights would have been '*objectively baseless* in that *no reasonable litigant could realistically expect success* on the merits," before a Court would consider defendant's subjective intent. Id. at 3, citing Professional Real Estate Investors, Inc., v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60 (1993) ("PRE"). Moreover, even if the Court were to reach the question of defendants' subjective intent, they argue, it would be "*Plaintiff's* burden to demonstrate that Universal's intent was improper rather than a genuine effort to assert its exclusive rights, and *Plaintiff* must meet that burden by clear and convincing evidence." Id. at 5.

With respect to the California litigation privilege, defendants assert that summary adjudication on this issue is improper, because it presents an issue of fact that the jury should decide. Id. at 11. Defendants contend that there is sufficient evidence for a jury to find that "litigation was 'contemplated in good faith and under serious consideration.'" Id. at 10-11. Specifically, defendants argue that the "cease and desist letter to Rock River–which expressly threatens litigation–is itself sufficient evidence to permit a jury [to] find for Universal on this element. . . . . But there obviously is other evidence as well, including documentary evidence that many people connected to the album were certain Universal would sue." Id. at 11.

In reply, plaintiff argues that defendants misconstrue the law, and "seek[] to automatically shift the burden to Rock River to prove that UMG's conduct does not merit *Noerr-Pennington* protection because the threatened litigation was a 'sham' without first showing that there was in fact any anticipated litigation." Reply at 1. Plaintiff argues that this is incorrect, as "the case law makes clear that before a party can invoke *Noerr-Pennington*, it **must** first show that there is some underlying petitioning activity, such as a lawsuit or seriously anticipated litigation." Id. at 3. "The core of UMG's counterargument is that any communication cloaked as a 'cease and desist' letter is inexorably related to petitioning activity and therefore automatically entitled to *Noerr-Pennington* protection. This would essentially mean that a defendant could always shift
///

the burdens associated with the doctrine via the 'sham' litigation test to the plaintiff merely by camouflaging its unlawful conduct as a threat of litigation." Id. at 2-3.

With respect to the California litigation privilege, plaintiff argues that defendants fail to put forth any evidence to satisfy the good faith and serious contemplation of litigation requirement. Id. at 6-7. "[T]here is no evidence in the record that UMG ever seriously contemplated commencing any actual litigation regarding its 'exclusive' license against anyone, let alone against the entities to which it sent its alleged 'cease and desist' letters." Id. at 8. First, plaintiff argues, "UMG failed to cite a single case to support its unfounded assertion that a cease and desist letter is facially protected under California law." Id. at 7. Moreover, plaintiff argues, the evidence put forth by defendants regarding "what various third parties may have thought about UMG's communications" is irrelevant. Id. at 8. "[U]nder California law, the test is whether UMG made those communications in good faith **and** whether UMG was seriously considering engaging in imminent litigation, not what other people might have perceived about UMG's actions." Id. at 8.

**B.** **Defendants' Motion for Summary Judgment**

**1.** **Noerr-Pennington**

Defendants argue that it is proper to grant summary judgment in their favor on the grounds that the complained-of acts are protected by the Noerr-Pennington doctrine. "[B]ecause each of Plaintiff's claims is premised on cease-and-desist letters sent by Universal (which are indisputably treated as First Amendment petitioning activity protected under *Noerr*), *Plaintiff* must prove that there is no dispute regarding Universal's rights. And given the mountain of evidence supporting Universal's rights, Plaintiff simply cannot meet this burden." Mot. at 1. Defendants frame the standard as follows: "*Noerr* protects *Universal's* conduct so long as there is some evidence to support Universal's position, even when there is competing evidence that, if believed, would refute it–i.e., unless asserting those rights would have exposed Universal and its lawyers to *Rule 11 sanctions and liability for malicious prosecution*." Id. at 1, 7, citing

PRE, 508 U.S. at 65. Therefore, defendants contend, to avoid the application of Noerr-Pennington, "[p]laintiff bears the burden to prove the existence of a sham, i.e., to 'disprove the challenged lawsuit's legal viability.' . . . . And sham is appropriately resolved by summary judgment." Mot., at 8, citing Amarel v. Connell, 102 F. 3d 1494, 1520 (9th cir. 1994), PRE. 508 U.S. at 63. "[T]he key question regarding the sham exception is: Did Universal have any 'competent evidence' (*Wilson*), or any argument that 'passe[s] the 'straight face' test' (*Kaiser*), to show that it held exclusive rights to *any* of the Recordings–such that Universal reasonably '*could* have believed that it had *some chance*' that its claim '*may* be held valid' (*PRE*). Here, Universal had substantial evidence that it held exclusive rights to all of the Recordings." Mot. at 8.

In support of their position, defendants argue that there is sufficient evidence to establish that the litigation threatened by Universal was not baseless. Defendants argue that there is evidence that (1) Universal properly acquired the rights from JAD, who owned the rights to all of the recordings (and that Lee Perry ("Perry") did not); (2) Perry did not ever claim to own the rights to at least three of the recordings at issue, even if he owned the rights to the remainder; and (3) even if Perry owned the rights to the recordings, that he assigned those rights to Universal-owned Trojan records. Id. at 9.

Defendants first argue that "[i]t is undisputed that Universal entered into a license agreement with JAD for the Recordings that on its face is exclusive; and that Universal paid JAD over a million dollars in advances for these rights and for JAD's representations and warranties that it held them." Id. "It is also undisputed that JAD provided Universal with documentary support for its exclusive rights." Id. This documentary evidence includes an agreement signed by producer Lee Perry that appears to acknowledge that the recordings in question "are [JAD]'s exclusive property." Id. at 10. "Although an affidavit purportedly signed by Perry in 1993 states that this 1981 agreement 'is a fake,' . . . other witnesses say differently." Id. In other words, defendants argue, plaintiff can only demonstrate that there is a question of fact as to whether the rights to the recordings in question were properly transferred to Universal,

but cannot show that "Universal had no 'competent evidence' that passed the 'straight face' test." Id.

As to three of the recordings–"Soul Shakedown Party," "Trench Town Rock," and "Lively Up Yourself," defendants argue that there is some evidence that suggests that Perry did not produce these tracks, and therefore would have no basis to claim ownership of them. Id. at 10-11. Further, defendants argue, "Perry made no claim as any of these tracks in the affidavits and agreements available to Universal at the time [the letters were sent]–as Universal informed Plaintiff. See Tuttle Decl., ¶ 4 & Ex. 3. To say that any reasonable person would have disregarded the JAD license and concluded that Perry owned these recordings, in the absence of evidence that Perry even *claimed* them, is absurd." Id. at 11.

Further, defendants argue, "[e]ven if Perry (and not JAD) were the holder of these rights, Perry assigned those rights to Trojan Records, which in turn was acquired by Universal in 2007. A series of agreements from 1969 to 1975 show Lee Perry assigning to Trojan 'in perpetuity' the 'sole and exclusive right[s]' to the very Marley recordings that Plaintiff contends Perry later licensed to San Juan, Plaintiff's alleged licensor. . . . . Another affidavit purportedly signed by Perry in 1994 states that his signature on one of those agreements is a 'forgery.' Tuttle Decl., Ex. 33, ¶¶ 7, 9-12. But an agreement signed and initialed by Lee Perry five years *later* reaffirms Trojan's rights." Id. Defendants assert that these documents constitute "'competent evidence' from which Universal could have perceived 'some chance' that even if Perry did own the rights, he assigned them to Trojan." Id. at 12.

In their motion, defendants also address evidence cited by plaintiff, and the allegations specifically relied on by the Court in its denial of defendants' motion to dismiss, and argue that the evidence now demonstrates that "none of these issues supports a conclusion that Universal's position was objectively unreasonable." Id., citing June 8, 2009 Order. First, defendants address plaintiff's allegation that "Universal demanded from JAD, but never received, evidence of JAD's title." Id. Defendant

contends that there is no evidence to support this allegation, but rather that the evidence shows that JAD provided the "chain of title" documents requested by Universal. Id.

With respect to the allegation that "Universal or its predecessors previously licensed Marley recordings from San Juan," defendant contends that this Court has already held that "such licenses 'have no bearing on [Universal's] objective basis for threatening to sue for violation of the copyright on the Recordings.'" Id. at 12-13, citing Aug. 25, 2008 Order. Moreover, defendants argue, the evidence does not support plaintiff's theory. "While Island Records inquired about licensing from San Juan in 1991, the inquiry stopped after Island asked for proof of San Juan's rights and San Juan failed to provide it." Id. at 13. Additionally, "[a]lthough Plaintiff claims that PolyTel (a company later acquired by Universal) licensed recordings from San Juan in the 1990s, [Tuttle Decl. ¶ 49], there is no evidence of what was known to PolyTel at the time. Chernow Tr. 153:25-154:25." Id. "Finally, Plaintiff claims that Universal Music Canada licensed several recordings from San Juan before Universal entered into its exclusive license with JAD, and continued to pay royalties to San Juan after the license. But there is no evidence that the Universal employees in Europe who negotiated and administered the JAD license were aware of the Canadian company's license until Phil Cox was informed in September 2006–at which point (1) Mr. Cox contacted Universal Music Canada and informed them of the JAD license; and (2) the royalty payments ceased." Id.

Defendants also argue that with respect to a 2002 Universal email "noting that Universal had just been approached by JAD about a possible license, and that there may be 'competing interests and claims that would have to be resolved before any deal for this catalogue could be viable,'" "the reference to 'competing interests' supports a finding that Noerr applies," and, moreover, "it is undisputed that after this email, Universal received evidence substantiating JAD's rights." Id. at 13. Similarly, defendants argue, plaintiff's evidence that "there are multiple albums in the marketplace containing tracks licensed from San Juan" is irrelevant to the Noerr analysis. "Plaintiff

has adduced no evidence to show that any reasonable person necessarily would have concluded that these other albums were the product of legally valid licenses." <u>Id</u>. at 14.

In opposition, plaintiff first argues that, as outlined in its own motion for summary adjudication, defendants are not entitled to *Noerr* protection because they never engaged in any petitioning activity. Opp. at 1. "Even if UMG could overcome that formidable hurdle, UMG is not entitled to summary judgment given the virtually insurmountable evidence demonstrating that (1) UMG could not reasonably have concluded UMG had exclusive rights in the 1969-72 Marley recordings; and (2) even if that were not true, UMG knew or should have known its enforcement rights were barred by laches and estoppel." <u>Id</u>. at 1-2. Alternatively, plaintiff argues, there is at least a question of fact as to objective reasonableness, and it should be left to the jury to determine. <u>Id</u>. at 13.

In support of its argument, plaintiff points to evidence in the record that it contends demonstrates the following: (1) UMG continued to license from and account to San Juan after the JAD license, precluding a finding of objective reasonableness; (2) UMG's internal documents show that UMG knew that UMG did not have exclusive rights; (3) UMG acquired Sanctuary/Trojan after the JAD licenses, evidencing UMG's knowledge that UMG had not acquired exclusive rights from JAD; (4) JAD did not produce evidence of its title, despite repeated demands by UMG. <u>Id</u>. at 2-3.

With respect to UMG's continued licensing from San Juan, plaintiff contends that "as recently as 2003, San Juan licensed [Marley sound] recordings, including 'Trenchtown Rock,' to UMG, which UMG included on its 'Best of Reggae' and 'Best of Ska' albums. [Blecher Decl., Ex. 2-3]." <u>Id</u>. at 4. Plaintiff also cites evidence that Island, a UMG label, initiated negotiations to license from San Juan, and that San Juan issued licenses to PolyTel, the terms of which "extended beyond when UMG acquired PolyTel in 1998. <u>Id</u>. at 4. Plaintiff also notes that both Sony and BMG "have manufactured and released albums featuring Bob Marley tracks licensed from San Juan, and the albums clearly identify San Juan as the licensor on the album credits." <u>Id</u>.

///

As to Trojan, plaintiff argues that it "also claims rights, derived from Lee Perry, to the 1969-72 recordings." Id. However, "[a]s UMG knows, Lee Perry submitted sworn testimony that Trojan's license terminated for non-payment. Blecher Dec. ¶ 21 & Ex. 33. Similarly, there is no indication that the alleged 1999 agreement the UMG cites is valid or binding." Id. In late 2007, UMG acquired Sanctuary, which owns Trojan. Id. at 2. Plaintiff argues that this purchase is inconsistent with Universal's claims that JAD and not Perry owned the rights to the recordings at issue because Trojan had been releasing these recordings based on "non-exclusive rights obtained from Lee Perry," and because the purchase would essentially be a re-acquisition of identical rights in the recordings."[4] Id. at 2-3. In sum, defendants argue, "After the UMG/JAD license in 2003, UMG (1) acquired Trojan/Sanctuary's claim to rights in October 2007; AND (2) continued to license from and account to San Juan until 2008. Accordingly, UMG knew that competing, non-exclusive rights to these recordings existed, and UMG executed inconsistent and contradictory deals to obtain rights from San Juan and Trojan and JAD." Id. at 4.

Moreover, plaintiff argues, "conspicuously absent from the record are any documents corroborating JAD or UMG's claim of rights."[5] Id. at 5. In addition, [i]n

---

[4]In reply, defendants argue that "[t]his 'argument' presumes that Universal's purpose in acquiring Sanctuary was to obtain the rights [that] Trojan may have acquired from Lee Perry. But Plaintiff has absolutely no evidence that was the purpose of that acquisition. Indeed, the only record evidence–deposition testimony from Phil Cox–is directly to the contrary." Reply at 9.

[5]Furthermore, plaintiff argues, even if there was an objectively reasonable belief that the rights to the recordings were properly held by JAD and transferred to UMG, it is clear that any suit by UMG would be barred by laches or estoppel. Plaintiff argues that laches or estoppel would apply in part because "[o]ver a span of nearly 40 years, JAD took no legal action to enforce its alleged exclusivity, or even responded to its own licensee's demands that it address San Juan." Id. at 12. Moreover, despite the fact that "[b]etween 2003-2007, 45 different labels . . . produced at least 73 different albums featuring pre-1972 Marley recordings, and at least 14 of the 73 albums were licensed from San Juan Music,"
(continued...)

1992, JAD executed a license which granted to the Bob Marley Foundation exclusively through 2002 'and non-exclusive thereafter' the 'worldwide perpetual right' to 20 1/2 sound recordings, including Trenchtown Rock, Soul Shakedown Party, and several others used on Rock River's album."[6] Id.

In reply defendants argue that "[p]laintiff makes repeated unfounded assertions that Universal 'knew' it had no basis for exclusivity. But none of these assertions is backed by evidence. Indeed, Plaintiff has no evidence whatsoever that Universal knew that anything it relied on was 'fabricated or otherwise false.' Instead, Plaintiff relies exclusively on lawyer argument that Universal 'should have' known–but lawyer argument is not evidence and 'should have known' does not establish a lack of probable cause." Reply at 6. Moreover, defendants argue, "[p]laintiff spent its entire opposition

---

[5](...continued)
"[n]either JAD nor UMG sued or obtained an injunction to stop any of these releases; therefore Rock River had no notion that UMG had any claim of exclusivity and was lulled into a sense of false security, investing substantial time and resources into the Album." Id. at 11-12. In reply, with respect to the issue of laches, defendants argue that "laches is an equitable defense, and therefore discretionary on the part of the Court. Plaintiff cites no case concluding that a petition is 'objectively unreasonable' or lacks probable cause because the litigant should have known that a defense would be raised and that a court necessarily would enforce the equitable, discretionary, affirmative defense." Reply at 11. Moreover, defendants argue, "the cases Plaintiff cites actually demonstrate laches would *not* apply here." Id.

[6] In reply, defendants argue that reference to this agreement is a "red herring. The undisputed evidence shows that Bob Marley Foundation the very next month turned around and re-licensed those rights to Island Records, a Universal label, so Universal held those rights as of 1993 even if JAD previously licensed them to Bob Marley Foundation. *See* Tuttle Decl. ¶ 21-23 & Exh. 18 at ¶ 1(a) (6/1/92 agreement by which Danny Sims/JAD granted rights in 'box set of Phonograph Records entitled 'Songs of Freedom' to Bob Marley Foundation) and Exh. 19 at ¶ 13 (7/1/92 letter agreement by which Bob Marley Foundation licenses recordings to Island for inclusion in the 'Box Set.')" Reply at 10-11. Defendants argue that "[t]his fact, at best, also creates nothing more than a genuine issue about who owns the rights to some of the recordings." Id. at 11.

trying to show that there is a genuine issue about who owns the rights to the recordings in question; however, . . . that is not the test on this motion." Id. at 8.

### 2. Plaintiff's Antitrust Claims

Defendants argue that plaintiff's antitrust claims also fail on the merits. First, defendants claim that "Plaintiff's proposed product market–'the sale and distribution of musical sound recordings . . . of the reggae genre'–is too narrow as a matter of law." Mot. at 15. Defendants assert that plaintiff "has no facts at all" to demonstrate that "reggae recordings are not 'interchangeable' with recordings of other types of music." Id. Defendants point to plaintiff's experts, and assert that "neither one contends that reggae is a 'market' for purposes of antitrust or economic analysis. . . . Plaintiff's reggae experts cannot assert that reggae is a market because neither has specific knowledge about reggae pricing." Id. at 16. Moreover, defendants argue, plaintiff's experts have offered testimony "demonstrat[ing] that music from other genres is substitutable." Id. at 17.[7]

Additionally, defendants argue, "[e]ven if Plaintiff could prove a proper product market, it still could not prove that Universal has 'market power' in the 'reggae' market." Id. at 18. "Courts typically examine a defendant's market share as the first step in analyzing market power. . . .There is a total failure of proof on this issue. Plaintiff has no admissible evidence of Universal's 'share' of the purported 'reggae' or any other market." Id. at 18.

Defendants also argue that plaintiff cannot show that there are any barriers to entry in the proposed market, another factor considered by courts. Id. at 18. "Indeed,

---

[7]In support of this argument, defendants refer to testimony suggesting that "consumers generally purchase music from more than one genre," that "music by a single artist can be classified as falling into more than one genre," that "there is no industry consensus on what defines a genre or how many there are," that "retailers generally market many different genres to consumers, with the hope and expectation that consumers will buy music from various genres," that "many successful albums, including reggae albums, are 'cross-overs,' attracting consumers who generally buy music of other genres." Mot. at 17, citing Jaeger Tr., Daniel Tr.

Prof. Spicer [plaintiff's expert musicologist] testified that there are *no* barriers to making and recording reggae music. Asked whether he thought there was *any* reason why a musician who wanted to make and record reggae music (as opposed to another genre) would face any difficulties, he responded: 'I don't see a reason why or why not. I have no basis to suggest that there would be barriers to recording a reggae album today.'" Id. at 19, citing Spicer Tr. 17:25-18:11. Defendants further argue that there is no evidence that Universal's conduct in connection with "Roots, Rock, Remixed," the 2003 JAD license, or the 2007 acquisition of Sanctuary "lessened competition or tended to create a monopoly." Mot. at 19-20.

In opposition, plaintiff contends that it has triable antitrust claims. Opp. at 14. "In this case, the 'gravamen of the Section 2 claim is the deliberate use of market power by a competitor to control price or exclude competition.' Finally, it is important to note that the antitrust laws have long condemned the kind of 'self-help' in which the UMG defendants have engaged." Id.

First, plaintiff argues, "[d]efining the relevant market 'is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility.' The proper relevant market definition 'can be determined only after a factual inquiry into the 'commercial realities faced by consumers.'" Id. at 15. Plaintiff outlines expert testimony relating to the definition of reggae as a "genre" of music and a "niche market" that it contends could be used by a jury to conclude that "reggae music" is a relevant antitrust market. Id. at 15-16. Additionally, plaintiff points to expert testimony that demonstrates that "[i]n the true meaning of 'reasonable substitutability,' reggae is **not** reasonably interchangeable with other genres of recordings because a 5% increase in reggae album prices will not induce consumers to buy something else. UMG's misconception is that if a consumer buys recordings **in addition** to reggae, it affects and defeats reggae as a relevant market." Id. at 16.

Further, plaintiff argues, it can demonstrate that UMG has dominant market power in the proposed market. Id. First, plaintiff argues, "UMG had the power to exclude and

exercised that power to exclude Rock River's Album from the market, indisputably reducing output. Uncontroverted evidence shows that UMG thwarted physical and digital distribution of 'Roots, Rock, Remixed' as well as potentially lucrative licensing revenues." Id. at 17. Plaintiff also argues that "[u]sing the surrogate test of market share, UMG is well beyond minimum monopoly numbers. . . . In 2007, UMG labels accounted for about 81% of the reggae sound recordings sold, and Bob Marley recordings accounted for 76% of the total reggae recordings sold." Id. at 18.

With respect to the issue of barriers to entry, plaintiff contends that it can demonstrate that defendants have "intellectual property rights, maintenance of a high market share, and control of superior resources," sufficiently to demonstrate barriers to entry so as to support a claim for monopolization. Id. at 19. "Given Bob Marley's significance to the reggae market, and UMG's control over Marley's post-1972 recordings, and given UMG's assertion of control over 1969-72 tracks as evidenced by its exclusion of Rock River's Album, UMG clearly has control over a resource necessary for effective competition. Moreover, UMG has maintained–because of its control of these superior resources–a high market share. Finally, UMG, the world's largest music company, owns a major distributors of non-UMG labels, Fontana, which was responsible for distributing Rock River's Album. UMG's decision to simply cease distributing a competitive album also operates as a barrier to new entrants who will observe how Rock River was treated (punished) by UMG for its competitive album. Accordingly, substantial evidence supports a jury finding that entry barriers exist to deter effective competition." Id. at 20.

Finally, plaintiff argues, defendants' alleged conduct with respect to the "Roots, Rock, Remixed" album is sufficient to show anticompetitive effect and a dangerous probability of monopolization, given that the "elimination of a single competitor may violate the Sherman Act if it harms competition." Id. "[A] jury could reasonably and competently find that UMG's conduct in suppressing the physical and digital

///

distribution of Rock River's Album constituted anticompetitive conduct and that UMG intended it to accomplish an anticompetitive objective." Id. at 21.

In reply, defendants argue that plaintiff's arguments are unpersuasive because "[p]laintiff has no evidence that consumers who purchase reggae . . . would not purchase other music if the price of reggae went up. Indeed, Plaintiff's music industry/reggae expert expressly disclaimed any knowledge on the topic." Reply at 14. Defendants argue that plaintiff's evidence shows only that reggae "has distinct characteristics," which is "irrelevant to determining the boundaries of a product market unless those distinctions make the products non-interchangeable from a consumer perspective. And on this point–whether consumers view reggae music as interchangeable with other genres of music–the factual record is undisputed." Id. "The only 'showing' that Rock River makes in opposition is that 'a consumer seeking to purchase a *Bob Marley* album' is unlikely to buy something else if the price of a Bob Marley album goes up 5%. . . . This isn't evidence of whether or not *reggae* music is interchangeable with other genres, and it cannot create a 'genuine issue' about whether reggae is a product market . . . . [it] cannot save Plaintiff's claim, both because courts consistently hold that proposed single-brand markets–like 'Bob Marley Music'–are improperly narrow *as a matter of law* . . . and because Plaintiff abandoned its allegation that there was a 'Bob Marley market,' Complaint (Dkt. 1) ¶ 6, after Universal moved to dismiss on this very point." Id. at 15.

With respect to market share, defendants argue that "[p]laintiff submitted no admissible evidence of Universal's market share in any market. In fact, Plaintiff's sole attempt to overcome this shortcoming was to submit the improper declaration from Jeff Daniel–who is the President of Rock River and a lay witness. Mr. Daniel purports to offer what plainly is expert opinion testimony." Id. at 16. "Mr. Daniel has not been designated as an expert, and he is not entitled to make pronouncements based on hearsay simply because he finds the hearsay to be reliable. And even if Plaintiff had wanted Mr. Daniel to offer expert testimony, Plaintiff would have had to designate him as a non-retained expert so that Universal could have deposed him and explored his various

'conclusions' regarding market share. As it is, the testimony must be excluded under Rule 701." Id. at 17.

With respect to barriers to entry, defendants argue that plaintiff's evidence goes only to the question of whether "there are barriers to entering the market for 'Bob Marley recordings owned by Universal," and that the rest of its argument is "mere lawyer assertion," and therefore insufficient to create a fact issue on summary judgment.[8] Id. at 18.

Finally, defendants argue, plaintiff shows no evidence "that Universal's conduct in connection with Plaintiff's album had any effect at all on competition or the competitive process, or increased Universal's market share or market power within the reggae or any other market." Id. at 19. With respect to plaintiff's claim that harm to a single competitor is sufficient to "meet its proof requirement with respect to 'anticompetitive element of monopolization,'" defendants argue that plaintiff misapprehends the holding in E.W. French & Sons, Inc., v. Gen. Portland, Inc., 885 F. 2d 1392 (9th Cir. 1989) which "did not say or imply that elimination of a single competitor–standing alone–is enough to prove competitive injury." Id. at 19-20.

Defendants also note that plaintiff did not directly respond in its opposition to defendants' argument that "Plaintiff has no evidence from which a jury could conclude that either the 2003 JAD license, or the 2007 acquisition of Sanctuary, substantially lessened competition or tended to create a monopoly in any market. Indeed, Plaintiff's experts testified that they had no knowledge of these events, and did not study their effects." Id. at 20. "There is no evidence to support the Section 7 claim, and Plaintiff should not be permitted to present it to a jury." Id. at 21.

///

---

[8]Moreover, defendants argue, "according to Plaintiff, there are not even significant barriers to releasing pre-1972 Marley recordings (after all, 45 different labels appear to have done so in a four year period) let alone the recordings of other reggae artists, including possible new reggae artists making new reggae recordings." Reply at 19.

### 3. Plaintiff's Tortious Interference Claims

With respect to claims of interference with prospective relationships with retailers "who would otherwise have sold Plaintiff's album," defendant argues that "Plaintiff did not have any economic relationship with these retailers; Universal did." Mot. at 20-21. According to defendants, plaintiff had a contractual relationship with a company called "Quango" "to assist Plaintiff in distributing its album; Quango in turn had a contract with Fontana, a wholly-owned (indirect) subsidiary of defendant Universal Music Group, Inc., to distribute Plaintiff's album; and Fontana entered into agreements with retailers for the purchase and sale of Plaintiff's album; Fontana is also the Universal company that communicated with the retailers and halted distribution of Plaintiff's album." Id. at 21. "Universal cannot be sued for interfering in its own contracts and relationships with these retailers; a claim for tortious interference with prospective economic advantage will not lie 'against a party to the relationship from which the plaintiff's anticipated economic advantage would arise.'" Id., citing Kasparian v. County of Los Angeles, 38 Cal. App. 4th 242, 262 (1995).

With respect to alleged interference in plaintiff's contractual relationship with Quango, defendant asserts that pursuant to the separate contract between Quango and Fontana, "Fontana had the express right to stop distributing any album it believed might infringe someone else's rights." Id. at 21. Therefore, defendant argues, the complained-of conduct was permissible because "one is entitled to protect one's own legal interest even if it interferes with someone else's contract; thus, interference with contract is justified when it results from a party's good faith assertion of its own legal interest or threat to enforce such interest." Id., citing Richardson v. La Rancherita, 98 Cal. App. 3d 73, 81 (1979); Rest. 2d Torts § 773. Defendant argues that "[a]s detailed in connection with *Noerr*, Universal had an entirely reasonable basis to conclude that Plaintiff (and thus Quango) did not have the right to distribute the album, and that the album infringed Universal's own rights." Id. at 22. Defendants further argue that this claim also fails because "Plaintiff has no evidence that it was in any way damaged by this alleged

interference. . . . It is undisputed that Plaintiff secured alternate distribution for its album through another distributor, and Plaintiff has put forward no evidence that it would have been better off had it remained with Quango." Id.

With respect to plaintiff's prospective relationship with EMI, defendant argues that there is also no evidence of damages. Id. at 22-23. "Moreover, Plaintiff has no evidence that Universal's conduct actually caused disruption to Plaintiff's relationship with EMI." Id. at 23. Additionally, "[t]o the extent that Plaintiff contends that Universal's communications with Apple were prohibited by § 512 of the DMCA, . . . then Plaintiff's tortious interference claim is preempted." Id. at 22.

Moreover, with respect to plaintiff's claims "involving the physical retailers, iTunes, EMI, and Relativity Media," these claims require a showing of "independently wrongful" acts, as plaintiff did not have contracts with these parties, making these claims for tortious interference with prospective advantage. Id. at 23. Defendants assert that plaintiff cannot show wrongful conduct, because "Universal's conduct did not violate the Sherman Act," the DMCA does not "apply to any of the conduct alleged," and "Plaintiff has adduced no evidence of intentional misrepresentations to these third parties, or that any of them relied on the purported misrepresentations to their detriment. . . . In sum, there is no evidence that Universal's reasonable efforts to protect its rights were independently wrongful." Id. at 24.

In opposition, plaintiff claims that defendants' conduct is not justified because "UMG's improper interference with Quango's distribution of the Album was sham, anticompetitive, wrongful, not in good faith, and not legitimate." Opp. at 21. Moreover, "[a]s Rock River's representatives and experts testified, UMG's blocking of the Album caused Rock River to suffer substantial damages." Id. at 22, citing Blecher Dec. ¶¶ 43-47 and Exs. 25-28. Plaintiff further argues that they have demonstrated wrongful conduct, because they have shown that UMG's actions were monopolistic and violated DMCA. Opp. at 22. Plaintiff also argues that the "DMCA does not preempt Rock River's tort claim pertaining to Apple. . . . There is no clear or manifest congressional

intent for such preemption." Id. at 23. "If the Court finds potential conflict between the tort and DMCA claims, Rock River should be permitted to elect which claim to pursue against UMG for its unlawful conduct involving Apple." Id.

### 4. Plaintiff's DMCA Claim

Defendants argue that plaintiff's DMCA claim fails because § 512(f) of the DMCA does not apply to this case. Mot. at 24. "'By limiting [§ 512(f)] to misrepresentations 'under this section' . . . the statute makes clear that it is limited to misrepresentations made in an attempt to invoke or comply with the provisions of Section 512. It is not a cause of action for general fraud.'" Id., citing Jay Dratler, Jr., CYBERLAW: INTELLECTUAL PROPERTY IN THE DIGITAL MILLENIUM, § 6.07[1] (2000). Defendants contend that Universal's "communications" with Apple were not "under" § 512 because the safe harbor scheme of § 512 does not apply to iTunes on the undisputed facts of the case. Id. at 25. Moreover, defendants argue, liability under section 512(f) requires "'actual knowledge of misrepresentation'; a defendant is not liable if he did not know his words were false even if he 'acted unreasonably.' *Rossi v. MPAA, Inc.*, 391 F. 3d 1000, 1005 (9th Cir. 2004). Plaintiff has no evidence that Universal had such actual knowledge in its emails with Apple, which simply asserted Universal's exclusive rights with respect to the Recordings." Id. at 24. Defendants further argue that "plaintiff's claim fails for lack of subject matter jurisdiction because U.S. copyright law–including DMCA § 12–does not apply to conduct occurring outside the United States," and "[t]he communications at issue were sent from a Universal employee in Europe to Apple's European office." Id. at 25, n. 19.

In opposition, plaintiff argues that defendants' argument is an attempt to "obfuscate the real issues related to Rock River's DMCA claim by arguing that because a nonparty to the case [Apple] would not be able to rely on the safe harbor provisions of § 512(c)(1) that none of § 512 applies to UMG's actions." Opp. at 23. "The only 'relevant inquiry in this case is whether defendant had a good faith belief that [Apple was] infringing its exclusive license when it sent them 'take-down notices.''" Id. at 24,

citing June 8, 2009 Order at 13. "As discussed above, UMG's take-down notice to Apple was a knowing misrepresentation because UMG knew that it did not have exclusive rights to the recordings used on 'Roots, Rock, Remixed.' In addition, the fact that UMG never brought suit against any entity claiming infringement for releasing albums featuring these 1969-72 recordings strongly suggests bad faith . . . . At the very least, the evidence, when viewed in the light most favorable to Rock River, 'raise[s] a genuine issue of fact as to whether defendant's 'cease and desist letters contained knowing misrepresentations' and should be left to the jury to decide." Id. at 24-25. With respect to subject matter jurisdiction, plaintiff argues that "[t]his Court has previously held that the effect of these communications was felt in the United States, and Apple's decision to remove the album from iTunes, and the actual implementation of that decision, occurred in California and UMG's 'infringement notice was aimed at Apple headquarters in Cupertino, California.'" Id. at 23, n. 59, citing April 5, 2010 Order at 10.

### C.    Conclusions of the Court

#### 1.    Defenses: Noerr-Pennington and the California Litigation Privilege

As a preliminary matter, the Court finds, that plaintiff is not entitled to summary judgment on the theory that the Noerr-Pennington doctrine does not apply to the correspondence at issue. The Court has already held that the cease and desist letters are facially immune, consistent with Sosa. Therefore, the only issue before the Court on these motions with respect to the Noerr-Pennington doctrine is the sham exception–in other words, whether there is a genuine dispute as to any material fact bearing on whether defendants had an objective basis on which to assert their exclusive rights in the recordings. The dispute presented by the cross-motions on this question is whether either party is entitled to judgment as a matter of law on this defense.

At oral argument, counsel for plaintiff sought to distinguish PRE on the grounds that that case arose on a set of undisputed facts. Consequently, according to plaintiff's

1   counsel, unlike the present case, there was no fact question to be decided by a jury.

2   Counsel for defendants argued that under PRE, the relevant inquiry is whether the

3   assertion of the claim of infringement was objectively baseless, nothing that in PRE the

4   Supreme Court likened the inquiry to that employed in determining whether a violation

5   of Rule 11 of the Federal Rules of Civil Procedure had occurred. "The Supreme Court

6   in PRE said that the standard is equivalent to Rule 11 . . . The Supreme Court in PRE

7   also said the standard is equivalent to the legal standard for probable cause and the Ninth

8   Circuit said that that means probable cause under California law." Tr. at 4. While the

9   Court agrees that PRE cannot be distinguished solely on the ground that it arose on

10  undisputed facts, and that the proper question is whether there was probable cause to

11  send the cease and desist letter, the Court concludes that a reasonable trier of fact could

12  find based on admissible evidence that the assertion of the claim of infringement was

13  made without an objectively reasonable basis. Perry's conflicting statements and other

14  significant discrepancies in the chain of title preclude the Court from finding as a matter

15  of law that UMG's conduct was objectively reasonable.[9] Also, the fact that UMG claims

16  an exclusive license, a non-exclusive license and knows that others claim a non-

17  exclusive license is sufficiently in conflict to create a dispute for a jury. The Court

18  therefore concludes that summary judgment in favor of either party on this issue may not

19  be granted.

20      The Court likewise concludes that plaintiff is not entitled to summary judgment on

21  the defense of the California litigation privilege. The Court finds that there is sufficient

22  evidence to present the jury the question of whether litigation was contemplated in good

23  _____

24      [9] The Court reaches this conclusion after considering the case law that defines
    probable cause. Generally, "[a] litigant will lack probable cause for his action if he relies
25  on facts which he has no reasonable cause to believe to be true, or seeks recovery upon a
    legal theory which is untenable." Leonardini v. Shell Oil Co., 216 Cal. App. 3d 547, 568
26  (1989). "This is an objective standard, and does not take into account the subjective mental
    state of the defendant." Franklin Mint v. Manatt, Phelps & Phillips, LLP , 184 Cal. App.
27  4th 313 (2010).

28

faith and under serious consideration, in light of, among other things, defendants' correspondence and the circumstantial evidence presented byt the conduct of the defendants and third parties.

### 2. Plaintiff's Antitrust Claims

The Court finds that defendants are entitled to summary judgment on plaintiff's antitrust claims in light of plaintiff's failures to show that there are genuine disputes as to product market definition, market power, and barriers to entry. Plaintiff does not present any evidence that demonstrates that the market for reggae sound recordings in the United States is a relevant product market for antitrust analysis. Plaintiffs have not offered any evidence sufficient to raise a fact issue to enable a trier of fact to find the existence of a relevant antitrust market for the sale of a single genre of music recordings. Plaintiff fails to present evidence regarding price-sensitivity of the market and plaintiff's experts have themselves offered testimony that supports defendants' argument that music from other genres is a reasonable substitute for reggae sound recordings. Plaintiff's evidence, as noted by defendants, improperly focuses on Bob Marley albums, rather than the reggae genre as a whole, and this Court has already concluded that defining the market as consisting of Bob Marley sound recordings is too narrow to be relevant for antitrust purposes. Moreover, there is no cognizable evidence before the Court with respect to market share. Defendants correctly object to the evidence presented in this connection by Mr. Daniel's testimony, in light of plaintiff's failure to designate him as an expert. Finally, plaintiff's experts themselves have offered uncontroverted testimony that there are no barriers to entry into the alleged market. In light of the failures of proof on these necessary elements, both plaintiff's §§ 2 and 7 claims fail. Therefore, the Court GRANTS defendants' motion with respect to plaintiff's first and second claims for relief.

### 3. Plaintiff's Tortious Interference Claim

The Court finds that defendants are not entitled to summary judgment on plaintiff's claim for tortious interference with contract and prospective economic

advantage. To the extent that plaintiff's claim is based on interference with prospective economic advantage rather than interference with contract, the Court concludes that there is a question of fact as to whether defendants' behavior was independently wrongful, in light of its conclusion that a reasonable jury might find that there was no objective basis for Universal's claims of exclusive rights. The Court also concludes that a reasonable jury could find that the plaintiff was damaged by the alleged interference, in light of the delay in the release and distribution of the album. Additionally, as discussed below, because the Court finds that the DMCA is not applicable to the instant dispute, it concludes that the DMCA does not preempt the tort action. Therefore, the Court DENIES defendants' motion with respect to plaintiff's third claim for relief.

### 4.    Plaintiff's DMCA Claim

Plaintiff alleges a DMCA claim pursuant to 17 U.S.C. § 512(f). Under this section, individuals or entities that make knowing misrepresentations "under this section [512]" with respect to alleged infringement may be liable for damages. Plaintiffs allege that defendants made the complained-of misrepresentation in their cease and desist letter to Apple with respect to the sale of plaintiff's album in Apple's iTunes online store, which they allege was a take-down notice pursuant to 17 U.S.C. § 512(c)(3).

The Court concludes that defendants are entitled to summary judgment on plaintiff's DMCA claim because the cease and desist letter at issue is not a DMCA take-down notice pursuant to section 512(c).[10] Section 512(c)(3) describes what the contents of a notification of infringement must be in order for the notification to be effective under section 512(c)(1)(C). Section 512(c)(1) describes the conditions under which a service provider may escape liability "for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network

---

[10] Plaintiff argues that the correspondence at issue is properly considered a DMCA take-down notice because "Apple's iTunes service falls under the definition of a service provider pursuant to § 512 (k)(1)." While iTunes may qualify as a service provider pursuant to § 512(k), the Court concludes that this is not sufficient to support plaintiff's claim, in light of the subject matter of the correspondence.

controlled or operated by or for the service provider." 17 U.S.C. § 512(c)(1). In addition to the plain language of the statute, as noted by defendants, legislative history indicates that this subsection was intended to apply to alleged infringement as a result of materials stored at the direction of users, rather than through the intentional activity of the internet service provider itself. H.R. Rep. No. 105-551(II) at 53 (1998) ("Information that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within [§ 512(c)]"). As defendants further note, "it is undisputed that Apple, and not its users, decides what material is available for purchase on iTunes. . . . that Apple chooses what material it will make available for download, that Apple (at its discretion) chooses to market certain recordings by featuring them on its website." Mot. at 25. Therefore, the Court concludes that the "take down letter" at issue is not a take-down letter as described in section 512(c) because it does not address claimed infringement "by reason of the storage at the direction of a user."[11] Because the "notification" at issue is not a notification pursuant to the DMCA, no claim under section 512(f) can stand. Therefore, the Court GRANTS defendants' motion for summary judgment with respect to plaintiff's fourth claim.

## IV.  CONCLUSION

In light of the foregoing, the Court GRANTS defendants' motion for summary judgment with respect to plaintiff's first, second, and fourth claims for relief. The Court

///

---

[11] Defendants also argue in their briefing that the DMCA is not applicable because iTunes unquestionably receives a financial benefit directly attributable to the alleged infringement, and therefore could not qualify for the safe harbor described under section 512(c). The Court rejects this argument. The Court's conclusion should not be read to imply that an internet service provider's inability to meet all of the safe harbor requirements takes a dispute entirely out of the ambit of the DMCA. Rather, the Court concludes only that where the manner of the alleged infringement is not of any of the types addressed in 17 U.S.C. § 512(c), (d), or (e), notice of claimed infringement given is not a section 512(c)(3) notification and therefore not subject to section 512(f).

DENIES defendants' motion with respect to plaintiff's third claim for relief.  The Court

DENIES plaintiff's motion for summary judgment with respect to defendants' defenses.

   IT IS SO ORDERED.


Dated: April 27, 2011

CHRISTINA A. SNYDER
UNITED STATES DISTRICT JUDGE